UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PATRICIA MAYO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 4:07-CV-1684 (CEJ) |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the

Social Security Administration.

## I. Procedural History

Plaintiff filed an application for disability insurance benefits under Title

II of the Social Security Act, 42 U.S.C. §§ 401 et seq., §§ 1381 et seq. (Tr. 80-

83). Plaintiff claimed disability due to congestive heart failure, hypertension,

high blood pressure, depression and anxiety. (Tr. 32, 80). Plaintiff alleges that

her disability began on October 1, 2004. (Tr. 80). The application was initially

denied by defendant. (Tr. 26). Plaintiff requested a hearing, which was held

before an Administrative Law Judge ("ALJ"). (Tr. 38-40). On February 24,

2006, the ALJ issued a favorable decision finding that plaintiff had been under

a disability since October 1, 2004. (Tr. 47-50). The Appeals Council, upon its

own motion, reviewed the case and remanded it to a second ALJ for an

additional hearing. (Tr. 53, 58-60).

Pursuant to the Appeals Council's remand order, a hearing was held on February 21, 2007 before a second ALJ.[1]  (Tr. 227).  Plaintiff testified in response to questions posed by the ALJ and by plaintiff's counsel.  (Tr. 227-238).  The ALJ also heard testimony from Jeffrey Magrowski, Ph.D., a vocational expert. (Tr. 238-242).  On March 22, 2007, the ALJ found that plaintiff was not disabled and denied her claim for benefits.  (Tr. 19-25).  Plaintiff requested review of the ALJ's decision by the Appeals Council.  (Tr. 10).  On August 6, 2007, the Appeals Council denied plaintiff's request for review.  (Tr. 6-8).  Therefore, the ALJ's determination denying plaintiff benefits stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the time of the second hearing, plaintiff was 41 years old.  (Tr. 229).  Plaintiff testified that she lived with her husband, their 4-year-old daughter, and occasionally her adult stepson. (Tr. 192, 231).  Plaintiff was primarily responsible for the daily care of her daughter, although she received some help from her sister and husband.  (Tr. 231-32).

Plaintiff testified that she graduated from high school and worked as a claims processor and auditor for an insurance company for over fifteen years.  (Tr. 229-30).  Plaintiff described her past work as a high stress job, requiring her to enter claims at a high rate of speed with great accuracy.  (Tr. 104).  Plaintiff stopped working due to medical complications arising from her

_____

[1]The ALJ referred to in this memorandum is the ALJ who issued the unfavorable opinion.

daughter's birth in September 2004. (Tr. 103). Plaintiff claims that she has been unable to work since then.

Plaintiff claims that her impairments severely limit her daily activities. (Tr. 123). While she used to visit friends in Illinois often and enjoy outdoor activities, she has lost interest in doing anything other than caring for her child. (Tr. 123, 237). She avoids going out often because it requires "too much effort". (Tr. 123). She mainly stays at home, watches televison, and cares for her child. (Tr. 123). She is no longer able to garden or go camping, activities she enjoys. (Tr. 237-38). Plaintiff claims to get two hours of sleep at most during the night. (Tr. 235).

Plaintiff testified that she suffers shortness of breath, rapid heartbeat and palpitations, and that she experiences chest pain on a daily basis. (Tr. 232). She also described a heightened anxiety over her health and financial problems. (Tr. 232-33). Plaintiff indicated that she was seeing a psychiatrist and a therapist. (Tr. 233).

The ALJ also heard testimony from Dr. Magrowski, the vocational expert. (Tr. 238-42). Dr. Magrowski testified in response to a hypothetical question that assumed an individual who could perform a full range of medium work and could understand, remember and carry out simple instructions, respond appropriately to supervisors and coworkers, with limited public contact. (Tr. 238-39). Dr. Magrowski testified that the hypothetical individual could work as a sandwich maker or a childcare attendant. (Tr. 239). In response to a second question, modifying the earlier hypothetical by including the

assumption that the individual could perform only a full range of light work, Dr. Magrowski testified that the individual could perform assembly work or as a store checker.  (Tr. 240).

Plaintiff's counsel asked Dr. Magrowski whether his answer would change if the individual suffered from severe anxiety and depression, mood swings, irritability, impaired coping skills, and who became overwhelmed when stressed.  (Tr. 241).  Dr. Magrowski indicated that he believed the question was a borderline medical question that he could not answer.  (Tr. 241).

### III. Medical Records

Plaintiff's child was born by emergency Cesarean section surgery on September 24, 2004.  (Tr. 135).  Her pregnancy was complicated by pre-eclampsia.[2]  (Tr. 133-35).  Shortly after the surgery, plaintiff suffered shortness of breath with increasing edema[3] to the point where she was unable to function.  (Tr. 133).  She was taken to the emergency room and noted to be in congestive heart failure with severe edema of both ankles.  (Tr. 133). Plaintiff required intubation and mechanical ventilation.  (Tr. 133).  Plaintiff

---

[2]Pre-eclampsia is the development of hypertension with edema during pregnancy.  See PDR Med. Dict. 1553 (3d ed. 2006).

[3]Edema refers to the accumulation of excessive amounts of watery fluid in cells or tissues.  See PDR Med. Dict. 612 (3d ed. 2006).

was diagnosed with postpartum cardiomyopathy[4], postpartum hypertension[5], postpartum pre-eclampsia, acute respiratory failure, acute renal failure, thrombocytopenia[6] and anemia. (Tr. 133).

On October 2, 2004, plaintiff was seen by David J. Sewall, M.D., who found plaintiff to be pleasant, alert and oriented. (Tr. 135). Plaintiff's blood pressure was 140/80 and her pulse was 100 beats per minute. (Tr. 135). An echocardiogram showed that plaintiff's left atrium and left and right ventricles were mildly dilated. (Tr. 147). There was moderate mitral valvular regurgitation. (Tr. 147). Plaintiff's left ventricular systolic function was moderately decreased. (Tr. 147). X-ray results indicated internal worsening of bilateral lung infiltrates. (Tr. 152). Plaintiff claimed to be feeling "much better" on October 3, 2004. (Tr. 138). It was noted that plaintiff was responding well to therapy, despite x-ray results showing a continued pulmonary edema. (Tr. 139). Plaintiff was discharged on October 7, 2004. (Tr. 134).

Plaintiff called the office of Kevin Smith, M.D., on October 11, 2004, complaining of fatigue. (Tr. 176). She was encouraged to rest and to call the office should her blood pressure fall below 100. (Tr. 176). Plaintiff was seen

---

[4]Postpartum cardiomyopathy is characterized by congestive heart failure following pregnancy in the absence of any known causes of heart disease. See PDR Med. Dict. 313 (3d ed. 2006).

[5]Postpartum hypertension is characterized by an increase in blood pressure post labor. See PDR Med. Dict. 928 (3d ed. 2006).

[6]A condition in which an abnormally small number of platelets is present in the blood. See PDR Med. Dict. 1984 (3d ed. 2006).

by Dr. Smith on October 14, 2004, complaining of a sore throat and nasal drainage. (Tr. 165). Dr. Smith noted that plaintiffs "blood pressure has been running very low and causing her ortostatic symptoms." (Tr. 165). Plaintiff was diagnosed with a probable viral upper respiratory infection. (Tr. 165).

The following day, plaintiff called Dr. Smith's office to report feeling lightheaded. (Tr. 176). Plaintiff claimed that her blood pressure was 75/42, and that she had nearly lost consciousness. (Tr. 176). On October 18, 2004, plaintiff again called to report feeling lightheaded. (Tr. 176). Her blood pressure remained low at 84/37. (Tr. 176). Plaintiff again complained of lightheadedness and fatigue in phone calls on October 27, 2004 and November 3, 2004. (Tr. 175).

Plaintiff was seen by Dr. Sewall on November 12, 2004 for a follow up with respect to her cardiomyopathy. (Tr. 174). Plaintiff reported to be "feeling well". (Tr. 174). She still suffered from some lightheadedness. (Tr. 174). Plaintiff's blood pressure measured 85/56 and her pulse was reported at 68 beats per minute. (Tr. 174). Plaintiff looked well during her physical examination and there was no edema present. (Tr. 174). Dr. Sewall found that plaintiff was "compensated for her cardiomyopathy". (Tr. 174).

On November 18, 2004, plaintiff underwent a dual isotope stress test, an exercise test used to rule out inducible myocardial ischemia[7]. (Tr. 172). The test was stopped shortly after three minutes of exercise due to plaintiff's

---

[7]Local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply. Stedman's Med. Dict. 894 (26th ed. 1995).

shortness of breath and fatigue. (Tr. 172). Plaintiff's heart rate peaked at 118 beats per minute during the test. (Tr. 172). Plaintiff reported no chest discomfort with exercise. (Tr. 172). The test results indicated a normal myocardial scan with no evidence of ischemia. (Tr. 172). On November 19, 2004, plaintiff was notified by Dr. Sewall's office that the stress test indicated that plaintiff's heart function was improving. (Tr. 174). On November 20, 2004, Dr. Sewall advised plaintiff that she could return to work. (Tr. 174).

Plaintiff was seen by Dr. Smith on December 22, 2004, with complaints of a dry cough. (Tr. 164). Plaintiff's cardiac exam was normal. (Tr. 164). There was no evidence of any congestive failure and plaintiff's cardiomyopathy was stable. (Tr. 164). Plaintiff was diagnosed with a viral upper respiratory infection and was instructed to take over-the-counter medications. (Tr. 164).

An echocardiogram performed on January 18, 2005 showed mild concentric left ventricular hypertrophy, mild left ventricular systolic dysfunction and trivial to mild mitral insufficiency. (Tr. 170-71). Plaintiff was notified by Dr. Sewall that the results of the echocardiogram were "OK." (Tr. 169).

Plaintiff called Dr. Sewall's office on February 16, 2005 complaining of chest pressure. (Tr. 169). Plaintiff reported her blood pressure as 135/69. (Tr. 169). Plaintiff indicated that her financial situation was stressful. (Tr. 169). Dr. Sewall believed that plaintiff's symptoms were caused by the stress. (Tr. 169).

Plaintiff was seen by Dr. Smith in a follow up appointment on March 4, 2005. (Tr. 161). Dr. Smith noted that plaintiff was currently taking Coreg[8], Lisinopril[9], and Lasix[10]. (Tr. 161). Plaintiff indicated that she was afraid of exercising due to her heart condition. (Tr. 161). Plaintiff complained of exhaustion, a lack of sex drive and feeling emotionally detached. (Tr. 161). Plaintiff was not having any suicidal thoughts. (Tr. 161). Plaintiff was diagnosed with worsening depression secondary to her cardiac disease. (Tr. 161). Dr. Smith increased plaintiff's Xanax[11] and Wellbutrin[12] intake. (Tr. 161).

Plaintiff was again seen by Dr. Smith on April 12, 2005 for a follow up on her anxiety, depression and cardiomyopathy. (Tr. 159). Plaintiff reported rapid heartbeats and elevated blood pressure. (Tr. 159). She indicated that she felt anxious, irritable and tired. (Tr. 159). Plaintiff's diagnosis was a history of congestive failure secondary to cardiomyopathy and ongoing problems with depression, irritability and anxiety. (Tr. 159).

---

[8]Coreg is indicate for treatment of mild to severe heart failure of ischemic or cardiomyopathic origin and for treatment of essential hypertension. See Phys. Desk Ref. 1416 (61st ed. 2007).

[9]Lisinopril is indicated for the treatment of hypertension. See Phys. Desk Ref. 2053 (61st ed. 2007).

[10]Lasix is used to treat hypertension and edema. See Attorneys' Dictionary of Medicine, L-45 (2006).

[11]Xanax is indicated for the treatment of panic disorder. See Phys. Desk Ref. 2655-56 (60th ed. 2006).

[12]Wellbutrin is indicated for the treatment of major depression. See Attorneys' Dictionary of Medicine, W-18 (2006).

On March 13, 2006, plaintiff presented to Dr. Sewall for a follow up examination of plaintiff's cardiomyopathy and hypertension.[13]  (Tr. 195). Plaintiff was feeling "quite well".  (Tr. 195).  Plaintiff indicated that she felt dyspneic[14] with extreme exertion, but had no similar problems when exercising normal exertion.  (Tr. 195).  Plaintiff still suffered a mild lower extremity edema at times, especially in the evenings.  (Tr. 195).  There had been no problems with palpitations or lightheadedness.  (Tr. 195).  An echocardiogram showed "good left ventricular systolic function".  (Tr. 195).  Plaintiff's blood pressure was 136/80 and her pulse measured 82 beats per minute.  (Tr. 195). Dr. Sewall opined that plaintiff's cardiomyopathy was resolved and that her blood pressure was "well controlled".  (Tr. 195).

Plaintiff was seen by Amy Stoppleman, a licensed clinical social worker, on May 24, 2006.  (Tr. 216).  Treatment notes indicate that plaintiff was stressed from her marriage, raising her child and losing her job.  (Tr. 216). She was struggling financially.  (Tr. 216).  Plaintiff's mood was noted as depressed.  Ms. Stoppleman indicated that plaintiff suffered from depression not otherwise specified and anxiety.  (Tr. 216).

---

[13]The record does not contain any physical or mental treatment notes from any medical provider from April 2005 through March 2006, other than a series of telephone prescription notations by Dr. Smith.  (Tr. 206-09). These notations indicate that plaintiff was prescribed Xanax, Lexapro, and Wellbutrin during this period.

[14]Dyspneic refers to shortness of breath. See PDR Med. Dict.  601 (3d ed. 2006).

Plaintiff again met with Ms. Stoppleman on June 7, 2006. (Tr. 218). Her depression had not improved. (Tr. 218). Plaintiff reported that she was seeking psychiatric treatment. (Tr. 218). She expressed concern that anti-depressants would not be effective for her because they had not worked in the past. (Tr. 218). Ms. Stoppleman's assessment continued to be depression not otherwise specified and anxiety. (Tr. 218).

On June 13, 2006, plaintiff seen by W. Edward Turner, M.D., for depression. (Tr. 191-92). Plaintiff had not had any previous psychiatric treatment. (Tr. 191). Plaintiff told Dr. Turner that her depression developed following her congestive heart failure. (Tr. 191). Dr. Turner noted that plaintiff's mood was depressed with constricted affect. (Tr. 192). Plaintiff's concentration was poor to fair and her insight and judgment were fair. (Tr. 193). Plaintiff's diagnosis remained major depressive disorder, recurrent. (Tr. 193). Dr. Turner assigned plaintiff a 60-65 GAF score and prescribed Cymbalta to help manage her symptoms. (Tr. 193).

On June 29, 2006, plaintiff presented to Ms. Stoppleman reporting that she was feeling better after only one week on the new medications. (Tr. 219). Plaintiff indicated that her home life situation had improved and was not as stressful. (Tr. 219). She indicated that her blood pressure had dropped two days earlier and that she had nearly fainted. (Tr. 219). Ms. Stoppleman encouraged plaintiff to follow up with Dr. Smith or Dr. Sewall regarding her blood pressure. (Tr. 219).

Plaintiff was seen by Dr. Turner again on July 11, 2006. (Tr. 190). Her diagnosis remained major depressive disorder, recurrent. (Tr. 190). Plaintiff expressed concern that her anti-depressant medications were aggravating her heart condition and causing her blood pressure to drop. (Tr. 190). Plaintiff complained of shortness of breath upon exertion. (Tr. 190). Plaintiff's mood was depressed. (Tr. 190). Plaintiff reported that she was not sleeping well. (Tr. 190).

Plaintiff met with Ms. Stoppleman for another therapy session the following day. (Tr. 220). Plaintiff stated that she had not felt well since her June 29 visit. (Tr. 220). On August 2, 2006, plaintiff complained to Ms. Stoppleman that Cymbalta was giving her headaches and that she felt like a prisoner inside her home. (Tr. 221).

Plaintiff's diagnosis was changed on August 10, 2006 following another visit with Dr. Turner. (Tr. 189). Based on the lack of response plaintiff was exhibiting to her current medications, Dr. Turner felt that a more appropriate diagnosis was Bipolar II Disorder.[15] (Tr. 189). Plaintiff was still moderately depressed and displayed irritability. (Tr. 189). Plaintiff reported that her sleep was good. (Tr. 189). Plaintiff discontinued taking Cymbalta and began taking medication for her bipolar disorder. (Tr. 222).

Plaintiff met with Ms. Stoppleman on August 30, 2006 and reported that she was feeling better with the new medication. (Tr. 223). She still reported

---

[15]Bipolar II Disorder is an affective disorder characterized by the occurrence of alternating hypomanic and major depressive episodes. See PDR Med. Dict. 568 (3d ed. 2006).

having home life stressors, but she was not as moody or irritable. (Tr. 223). On August 31, plaintiff called Ms. Stoppleman's office to report that she was having a difficult day. (Tr. 224). Plaintiff stated that she felt that her life was out of control due to her health issues. (Tr. 224). Plaintiff was still depressed when she met with Ms. Stoppleman on September 14, 2006. (Tr. 225).

Plaintiff presented to Dr. Turner on September 15, 2006. (Tr. 188). Plaintiff reported mood swings. (Tr. 188). She was stressed because she was receiving little support from her husband with household tasks. (Tr. 188). She reported relationship problems with her husband. (Tr. 188). She also indicated that she was having difficulty sleeping and suffered feelings of guilt and hopelessness. (Tr. 188). Dr. Turner noted that plaintiff was mildly depressed. (Tr. 188).

Plaintiff again presented to Dr. Turner on October 4, 2006. (Tr. 187). Her mood was euthymic. (Tr. 187). Mood swings were not present, although plaintiff still exhibited feelings of helplessness. (Tr. 187). Plaintiff reported feeling overwhelmed by day-to-day tasks. (Tr. 187).

In a counseling session with Ms. Stoppleman on October 12, 2006, plaintiff reported that she had been standing up for herself more with others, including her husband and son-in-law. (Tr. 226). Plaintiff indicated that others were treating her better since she implemented these changes. (Tr. 226).

Treatment notes from the November 7, 2006 examination by Dr. Turner indicate that plaintiff was moderately depressed and suffered from poor self-

esteem. (Tr. 186). Plaintiff felt that there was "little purpose in life". (Tr. 186). Plaintiff reported feelings of guilt, hopelessness and irritability. (Tr. 186). Her sleep continued to be interrupted. (Tr. 186).

Plaintiff reported only a slight improvement in her mood on December 14, 2006. (Tr. 185). Dr. Turner described plaintiff's mood as moderately depressed. (Tr. 185). Plaintiff still suffered from depression and anxiety. (Tr. 185). Plaintiff's diagnosis remained Bipolar II Disorder. (Tr. 185).

Dr. Turner completed a medical assessment of plaintiff's ability to do work related activities on January 30, 2007. (Tr. 181-83). Dr. Turner noted that plaintiff continued to exhibit heightened irritability and short temperament. (Tr. 181). Dr. Turner indicated that plaintiff gets easily frustrated and falls into depressive periods with crying spells with even minimal stressors. (Tr. 181). Dr. Turner opined that plaintiff would have great difficulty coping in any work environment where she had to interact with more than one or two other people. (Tr. 181).

Dr. Turner found that plaintiff had a fair to good ability to follow work rules, a good ability to use judgment and a fair ability to interact with supervisors and to function independently. (Tr. 182). However, he felt that plaintiff had little if any ability to relate to coworkers, deal with the public, deal with work stressors, or to maintain attention. (Tr. 182).

Ms. Stoppleman completed an identical form on February 10, 2007. (Tr. 201-03). Ms. Stoppleman reported that plaintiff continued to be challenged with anxiety was unable to deal with stress. (Tr. 203). According to Ms.

Stoppleman, plaintiff wants to work and struggles with being unable to do so. (Tr. 203). Ms. Stoppleman noted that plaintiff had a very good ability to follow work rules, a good ability to relate to coworkers, and a fair ability to deal with the public, interact with supervisors, function independently, and to maintain attention. (Tr. 201). Ms. Stoppleman felt that plaintiff had little, if any, ability to use judgment or deal with work stressors. (Tr. 201). Dr. Turner and Ms. Stoppleman agree that plaintiff has no ability to understand, remember and carry out complex job instructions. (Tr. 183, 202).

## IV. The ALJ's Decision

The ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Social Security Act on October 1, 2004.

2. The claimant has not engaged in substantial gainful activity since at least October 1, 2004.

3. The medical evidence establishes that the claimant has a cardiomyopathy, essential hypertension and a bipolar disorder, but that she does not have an impairment or combination of impairments listed in, or medically equal to, the appropriate listings set forth in Appendix 1, Subpart P, Regulations No. 4.

4. The allegations of symptoms, or combination of symptoms, of such severity as to preclude all types of work activity are not consistent with the evidence as a whole and are not persuasive.

5. The record establishes that the claimant can perform a full range of heavy work with the additional restrictions of understanding, remembering and carrying out more than simple instructions and non detailed tasks and limited contact with the public.

6. The claimant cannot perform her past relevant work.

7.    The claimant is forty-one years old and has twelve years of education.

8.    In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

9.    The claimant can perform other work existing in significant numbers.  This finding is based upon the credible testimony of the vocational expert.

10.    The claimant has been able to perform other work, existing in significant numbers, since October 1, 2004.

11.    The claimant has been able to perform substantial gainful activity since October 1, 2004.  The claimant was not under a disability, as defined under the Social Security        Act, at any time through the date of this decision.

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv., 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, she is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy. If the claimant is not, she is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

## A.   Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate

to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  The Court may not reverse merely because the evidence could support a contrary outcome.  Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.    the ALJ's credibility findings;

2.    the plaintiff's vocational factors;

3.    the medical evidence;

4.    the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.    third-party corroboration of the plaintiff's impairments; and

6.    when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

B.    **Plaintiff's Allegations of Error**

Plaintiff asserts that the ALJ failed to properly consider plaintiff's residual functional capacity. Specifically, plaintiff argues that the ALJ did not fully consider the medical opinion of Dr. Turner, as plaintiff's treating physician, and Ms. Stoppleman as plaintiff's primary counselor. Plaintiff also claims that the ALJ failed to ensure a fully and fairly developed record.

Additionally, plaintiff contends that the ALJ improperly found that plaintiff's subjective complaints were not credible. Finally, plaintiff claims that the hypothetical question posed to the vocational expert was flawed and did not capture the concrete consequences of plaintiff's impairment. Therefore, plaintiff contends, the testimony of the vocational expert can not be considered substantial evidence and the ALJ erred by relying upon it.

The Court will first examine plaintiff's argument that the ALJ's residual functional capacity ("RFC") assessment was erroneous. It is the duty of the ALJ to determine plaintiff's RFC after considering all relevant evidence. See Lauer v. Apfel, 245 F.3d 700, 703-704 (8th Cir. 2001). However, "[a] claimant's residual functional capacity is a medical question." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Thus, while the ALJ must consider all relevant evidence, at least "some medical evidence" must support the residual functional conclusions of the ALJ. See Lauer, 245 F.3d at 704.

The ALJ found that plaintiff retained the RFC to perform a full range of heavy work with the additional restrictions of understanding, remembering and carrying out no more than simple instructions and non detailed tasks with limited contact with the public. (Tr. 25). The ALJ noted that plaintiff was

unable to perform her past relevant work, but found that plaintiff could perform other work existing in significant numbers in the national and regional economy. (Tr. 25). Accordingly, the ALJ found that plaintiff was not disabled. (Tr. 25). Plaintiff contends that the ALJ's RFC determination is inconsistent with the opinion expressed by Dr. Turner and failed to give proper consideration to the opinion of Ms. Stoppleman. Plaintiff also contends that the ALJ erroneously found that plaintiff had no disabling physical limitations.

The Court begins with plaintiff's argument that she continues to suffer from physical limitations from her cardiomyopathy. While it is clear that plaintiff did suffer from cardiomyopathy following the birth of her daughter, the medical records strongly indicate that her condition has resolved, at least to the point where it is no longer disabling. First, on November 12, 2004, Dr. Sewall stated that plaintiff was New York Heart Association Class I to II. (Tr. 174). Class I indicates "no limitation" of physical activity while Class I indicates "slight limitation" of physical activity. See Cooper v. Bowen, 1987 WL 18919 at *1-2 (N.D. Ill. 1987). On November 20, 2004, Dr. Sewall informed plaintiff that she could return to work. (Tr. 174). Results of an echocardiogram performed on January 18, 2005 were "OK." (Tr. 170). On March 4, 2005, plaintiff's cardiac status was "stable". (Tr. 161). Plaintiff was feeling "quite well" on March 13, 2006 and an echocardiogram showed good left ventricular function. (Tr. 195). Plaintiff's blood pressure was "well controlled" and her cardiomyopathy was "resolved". (Tr. 195). Clearly, the

medical records support the ALJ's determination that plaintiff no longer suffers from any significant physical limitations from her cardiomyopathy.

With respect to the mental RFC assigned to plaintiff, the ALJ found that plaintiff was restricted to work where she would be required to understand, remember and carry out no more than simple instructions and non detailed tasks, with limited contact with the public. (Tr. 25). This is reflective of Dr. Turner's conclusions that plaintiff could not carry out complex or detailed job instructions and had no useful ability to deal with the public. (Tr. 182-183). However, the ALJ failed to mention several other limitations described by Dr. Turner, such as plaintiff's inability to relate to coworkers, deal with work stressors, or maintain concentration or attention. (Tr. 182). Specifically, Dr. Turner found that plaintiff would be unable to work in an environment in which there were more than one or two other people. (Tr. 181). Plaintiff's inability to deal with work stressors is illustrated by Dr. Turner's statement that plaintiff becomes irritated and overwhelmed when stressed and that she `reacts by crying. (Tr. 182). Dr. Turner also opined that plaintiff had serious limitations on her ability to interact with supervisors and to function independently. (Tr. 182).

The ALJ is not required to adopt the opinions of the treating physician. However, "[w]hether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight." Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008). Here, the ALJ adopted only a portion of Dr. Turner's opinion without providing any

explanation for ignoring the other portion of Dr. Turner's assessment. "While the ALJ did incorporate portions of the [treating physician's] assessment, the ALJ should have given reasons for ignoring significant portions of it." Bissett v. Astrue, 2008 WL 4371332 at *5 (S.D. Iowa, 2008). The ALJ's RFC determination failed to mention Dr. Turner's conclusion that plaintiff could work with no more than one or two other people, that she has no useful ability to maintain concentration or attention, or deal with work stressors. These are significant limitations that the ALJ should have included in plaintiff's RFC, or alternatively, provided explanation for why they were not included. "There may well be good reasons why the ALJ discredited [the above] restrictions." Bissett, 2008 WL 4371332 at *6. "However, without an explanation, the Court is unable to provide meaningful review." Id.

Even though the ALJ erred in failing to discuss several of the limitations described by plaintiff's treating physician, such an error would be harmless if the vocational expert considered the limitations and still concluded that plaintiff could perform "other work". The vocational expert was asked the following hypothetical:

> [W]e're going to assume this hypothetical claimant... [is] able to understand, remember and carry out at least simple instructions and non-detailed tasks, can respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and frequent, with limited public contact, and she can adapt to routine simple work changes and can take appropriate precautions to avoid hazards. (Tr. 239).

This question does not include all of the above limitations described by Dr. Turner. For example, the limitations presented to the vocational expert did

not include working with only one or two coworkers and avoiding even minimal work stressors. Had these limitations been included in plaintiff's RFC determination, the testimony of the vocational expert may have differed and plaintiff may have been found disabled. Therefore, the error was not harmless and the Commissioner's decision must be reversed and remanded for further proceedings. The Court need not reach plaintiff's other claims for relief.

## VI. Conclusion

For the reasons discussed above, the Court cannot find that the Commissioner's decision is supported by substantial evidence in the record as a whole. This matter is remanded for a renewed assessment of plaintiff's mental residual functional capacity. Upon reconsideration, the ALJ should include all of the restrictions described by the treating physician in plaintiff's mental residual functional capacity determination, or, in the alternative, provide valid explanation for why such restrictions are not being included.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this case is **remanded** for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

A separate judgment in accordance with this Memorandum and Order shall be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT COURT

Dated this 16th day of March, 2009.